J-S22008-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREW ROBERT HESS | : | |
| | : | |
| Appellant | : | No. 1883 EDA 2025 |

Appeal from the PCRA Order Entered June 13, 2025
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0002823-2014

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.: **FILED AUGUST 10, 2026**

Andrew Robert Hess appeals from the order entered in the Court of Common Pleas of Northampton County denying his Post-Conviction Relief Act[1] petition. Hess challenges the stewardship of trial counsel. After careful consideration, we affirm.

A prior panel of this Court accurately set forth the facts underlying Hess's first-degree murder[2] conviction as follows:

> [Hess] and the victim, Richard Parker, were close friends. However, this friendship became strained when [Hess] began an intense but short-lived relationship with Jessica Drake. Although the relationship lasted only five and one-half months, [Hess] and Drake remained close friends, and [Hess] believed they would eventually resume their relationship. Instead, Drake became romantically involved with Parker. [Hess] was "in denial" about

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

[2] 18 Pa.C.S.A. § 2502(a).

the situation and furious [with] Parker; Parker left [Hess] voicemails telling him to stay away from Drake. [N.T. Trial, 9/11/15, at 12.] [Hess] did not speak to Parker after Drake became involved with him.

On July 10, 2014, Drake met [Hess] at his place of work and made tentative plans to meet again later that evening. They did not meet. Instead, Drake went to see Parker at the garage where he worked. Later that night, [Hess] texted Drake to say that he was waiting for her, but she informed [Hess] she would have to reschedule. Drake slept at the garage with Parker that evening.

On July 11, 2014, at approximately 12:30 a.m., [Hess] drove to the garage. [Hess] banged on the door, waking Parker and Drake. When Parker answered, an altercation ensued during which [Hess] stabbed Parker multiple times. Drake ran to the door, where Parker told her that [Hess] had stabbed him. He asked her to call 911 before collapsing. [Hess], standing outside the door, asked, "I'm going to jail, aren't I?" [N.T. Trial, 9/9/15, at 56.]

Drake observed serious injuries to Parker's abdomen and back, and she called 911 on her cell phone. While she attempted to put pressure on Parker's wounds, [Hess] left the scene but returned to help her direct emergency personnel to the location.

Police arrived at approximately 1:30 a.m. and found Parker lying on his back inside the doorway, deceased, with a large wound in his abdomen. The fatal injury was a deep stab wound to his back. Parker also suffered defensive wounds on both of his palms and his torso. Copious amounts of blood stained the ground a small distance from the body.

[Hess], who had an injured lip and blood on his face, shirt, and jeans, informed the officer he had gotten into a fight with his brother earlier that day and had gotten blood on him trying to help Parker. [Hess] was taken into custody, and the twelve-inch serrated knife used in the murder was recovered from a nearby pond.

[Hess] was transported to Pennsylvania State Police barracks for questioning and waived his *Miranda* rights. [Hess] initially claimed he did not know what happened to Parker. He stated that Parker had already been injured when he arrived and he became covered in blood when he tried to move Parker's body. However,

confronted with inconsistencies in this story, [Hess] then stated that Parker had assaulted him.

[Hess], crying, claimed Parker was jealous that [Hess] and Drake were trying to rekindle their romantic relationship. [Hess] claimed Drake informed [him] that Parker had raped her, although Drake later denied this. [Hess] then stated he could not believe he had stabbed his friend and killed him[] and was "just trying to get him off" of him. [*Id.* at 60.] Following his interrogation, [Hess] was arrested and charged with one count of criminal homicide.[3]

On September 8, 2015, the matter proceeded to trial before a jury. At trial, [Hess] testified in his own defense. He stated that upon driving to the garage, he was anxious because Drake had informed him that Parker felt he "might not be able to [contain] himself around [Hess];" he believed Parker was the stronger of the two men; and he knew Parker kept a shotgun in his garage. [N.T. Trial, 9/14/15, at 53.] [Hess] claimed this fear was the reason he brought a knife to the confrontation. However, [Hess] also admitted that in his seven years of friendship with Parker, [he] did not know [Parker] to be an aggressive person.

[Hess] testified that upon arriving at the garage, he told Parker they needed to talk. However, Parker grabbed him from behind and began to strangle [Hess] and punch him in the head. [Hess] stated he was unable to escape, very scared, and thought he was going to die. However, he also admitted that he could move and breathe. At that point, he removed the knife from his waistband and began swinging it around. Parker fell and attempted to get up. [Hess], who assumed [Parker] was trying to reach the shotgun, stabbed him in the back.

Trial concluded [on] September 15, 2015, when the jury convicted [Hess] of first-degree murder. The court proceeded immediately to sentencing and imposed the mandatory sentence of life imprisonment.

[Hess] timely filed a post-sentence motion challenging the weight and sufficiency of the evidence. The trial court denied [Hess's] motion on February 11, 2016.

_____

3 18 Pa.C.S.A. § 2501(a).

*Commonwealth v. Hess*, 2017 WL 817125 at \*1-2 (filed Mar. 1, 2017) (unpublished memorandum) (prefixes and some quotation marks omitted). On March 1, 2017, this Court affirmed Hess's judgment of sentence. *See id.* at \*1. Hess subsequently filed a petition for allowance of appeal, which our Supreme Court denied on October 12, 2017. *See Commonwealth v. Hess*, 172 A.3d 1113 (Pa. 2017) (*per curiam* order).

On January 7, 2019, Hess timely filed a counseled PCRA petition, in which he alleged that trial counsel rendered ineffective assistance by failing to, *inter alia*, (1) "present medical evidence of Hess's grand mal seizures" in support of his self-defense claim and (2) present "Drake's father[, Perry "Whitey" Jensen,] and his significant other Linda as [witnesses] at trial" to testify that "Drake made statements to them that contradicted her trial testimony" and that Drake "was a chronic liar[.]" *See* PCRA Petition, 1/7/19, at ¶ 63(a), (f). The court held a bifurcated evidentiary hearing on May 30, 2024, and January 13, 2025 at which Hess presented the testimony of various witnesses. On June 13, 2025, the PCRA court denied Hess's petition, and Hess timely filed a notice of appeal. On September 10, 2025, Hess filed a court-ordered concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). In response, on September 12, 2025, the PCRA court filed a statement, pursuant to Pa.R.A.P. 1925(a), in which it suggests that Hess's appeal lacks merit based on the reasons set forth in its order and opinion dated June 13, 2025.

On appeal, Hess presents the following questions for our review:

1. Was [trial counsel] ineffective when he failed to present expert medical evidence of Hess's fear of epileptic seizures and failed to argue said fear in his closing statement?

2. Was [trial counsel] ineffective when he failed to present [Whitey] Jensen and Linda Jensen as witnesses to testify to the reputation for dishonesty of a critical Commonwealth eyewitness?

Appellant's Brief, at 4 (formatting altered; suggested answers omitted).

Hess challenges the PCRA court's denial of his ineffective assistance of counsel claims following an evidentiary hearing. Our review of the denial of a PCRA petition "is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." **Commonwealth v. Baynard**, 355 A.3d 21, 26 (Pa. Super. 2026) (citation omitted). "A PCRA petitioner has the burden of persuading an appellate court that the PCRA court erred and that such error requires relief." **Commonwealth v. Hunter**, 355 A.3d 394, 414 (Pa. Super. 2026) (internal quotation marks, brackets, and citation omitted). "We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party." **Baynard**, 355 A.3d at 25 (citation omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Id.** (brackets and citation omitted).

A PCRA petitioner may be eligible for relief if he pleads and proves, by a preponderance of the evidence, that his conviction is the product of the

"[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). "A court's review of a claim of ineffective assistance of counsel begins with the strong presumption that counsel was effective." ***Commonwealth v. Pacheco***, 340 A.3d 1038, 1041 (Pa. Super. 2025) (citation omitted).

> To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance[.] A PCRA petitioner must address each of these prongs on appeal. A petitioner's failure to satisfy any prong of this test is fatal to the claim.

***Commonwealth v. Smith***, 352 A.3d 111, 116 (Pa. 2026) (quotation marks and citations omitted). We have previously addressed the consideration that we must give to these three elements:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. The ultimate question of whether facts rise to the level of arguable merit is a legal determination.

> Regarding the second prong of the ineffectiveness test, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if [a petitioner] proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

> With respect to the prejudice prong, the petitioner must demonstrate that but for the errors and omissions of counsel,

- 6 -

there is a reasonable probability that the outcome of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding. The prejudice inquiry requires consideration of the totality of the evidence.

*Pacheco*, 340 A.3d at 1042 (ellipses, brackets, and citations omitted). "Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Gibson*, 318 A.3d 927, 934 (Pa. Super. 2024) (brackets and citation omitted).

First, Hess claims that counsel was ineffective "for failing to present expert medical evidence at trial to demonstrate Hess's fear of seizures as part of his justification defense" and "for failing to argue about Hess's fear of seizures in his closing statement." Appellant's Brief, at 19. Hess avers that his ineffectiveness claim has arguable merit, where counsel "knew or should have known that [] Hess's fear of having a seizure was relevant to the subjective aspect of his self-defense claim" and "expert witness testimony would have been admissible on this topic." *Id.* at 23 (citation omitted). Hess contends that counsel lacked a reasonable basis for his inaction where Hess's fear of having an epileptic seizure "clearly went to the heart of his justification defense," counsel referenced "Hess's fear of having seizure" in his opening

statement[4] and had "personal knowledge of the debilitating effects of epilepsy," and Hess's parents expressed their desire for counsel "to look into the issue" and provided counsel with "Hess's medical records, including most notably the references to brain pathology and the presence of a neurocognitive disorder." *Id.* at 23-24. Hess further contends that he was prejudiced by counsel's inaction where, at trial, Hess "denied any intent to kill Parker" and the evidence "reflected his lack of criminal culpability." *Id.* at 24, 25.

Hess's first ineffectiveness claim does not warrant relief, as he has not demonstrated that counsel lacked any reasonable basis for failing to present expert testimony concerning Hess's fear of seizures as part of his justification defense. *See Smith*, 352 A.3d at 116; *Pacheco*, 340 A.3d at 1042. At the PCRA hearing, counsel explained that his decision not to present evidence of Hess's epilepsy was an agreed-upon strategy he discussed with Hess prior to trial and that, in light of this strategic decision, counsel did not believe that the testimony of an expert witness at trial would be relevant in light of the pre-trial statements made by Hess to the police and the concern that this proposed evidence would have actually negatively reflected on Hess'

_____

[4] In his opening statement, counsel contended to the jury as follows: "Parker is very strong. [Hess] feels that arm tightening around his neck and, as he's experiencing this, as he's feeling his inability to breathe, he's worrying. Am I going to have a seizure? Is he going to choke me out? I can't breathe. Am I going to pass out? What's going to happen? Is he going to kill me?" N.T. Trial, 9/9/15, at 34-35.

credibility. *See* N.T. PCRA Hearing, 5/30/24, at 99-100, 83. The PCRA court

cogently addressed Hess's argument as follows:

> [The court] first note[s] that at the PCRA hearing, [it] found [trial counsel's] testimony credible. Because [counsel's] statements were credible[] and given the highly deferential standard of evaluating his decisions during trial, [the court] cannot conclude that [counsel] had no reasonable basis for failing to present medical evidence relating to Hess's epilepsy and seizures.
>
> At the PCRA hearing, [counsel] detailed the defense's theory at trial and clearly articulated his reasoning for not introducing medical evidence relating to Hess's epilepsy and seizures at trial. First, the record establishes that [counsel] was aware of Hess's epilepsy and seizures. [Both Hess and his parents] testified that they discussed Hess's epilepsy with [counsel]. [Hess's parents] provided [counsel] with medical documents relating to Hess's epilepsy and seizures.
>
> Second, [counsel] opined that based upon Hess's statements and confession to police, self-defense was Hess's best defense at trial[:]
>
> > Q. So did you develop a defense theory of the case?
> >
> > A. Develop might be the wrong word. I think I had a theory of the case kind of imposed upon me. After speaking with [] Hess, getting a copy of the criminal complaint and all of the police reports, it was apparent that [] Hess had been interviewed by the police, waived his right to counsel, had been interviewed by the police for a number of hours—I can't remember how many, but I do remember it was a significant period of time—in which he had denied being there at all, that he had simply come after it happened. He spent a lot of time saying that [to] the police but then eventually told them that he had acted in self-defense. So that was kind of what I felt was the only way that we could go was that story.
> >
> > Q. Okay. When you said imposed upon you—
> >
> > A. Just by the facts of the case.

[*Id.* at 64-65].

Third, [counsel] explained that Hess changed his version of events two times when Hess was questioned by the police. [Counsel] explained that changing Hess's version of events a third time would not have been successful:

> I remember thinking, you know, if you say to the police for a number of hours denying even being there and you're on the record changing your story to yeah, I was there but it was self-defense, then I do not believe it would be a successful defense strategy to change [track] again and come up with another version because that would expose him to, you know, claims of well, you were lying then, then you lied again and now you're telling us a third version of what happened. So I did not think that would be successful. Given what my client was telling me happened that night and what he had told the police, I thought self-defense was the only viable defense strategy.

*Id.* at 65-66.

Fourth, [counsel] testified that Hess did not indicate that he thought he was going to have a seizure on the night of the murder. [Counsel] stated[:] "He never told me he had a seizure. He did not tell me that he had felt one coming on or anything of that nature. So I didn't want to make more of the epilepsy issue than that." *Id.* at 82. [Counsel] explained that he did not want to have the jury doubt Hess's ability to recollect the night of the murder. In fact, by Hess's own admission, seizures have had "a significant impact" on his memory. *Id.* at 122. Hess explained:

> I'm terrible with dates and names and recalling a lot of things. My memory is not, I would say, half of what it once was. I struggle with remembering the simplest things anymore, and I just—I feel very impaired because of it, and it's very tough.

*Id.*

Finally, [counsel] explained that introducing evidence relating to Hess's epilepsy and seizures could affect Hess's credibility. [Counsel indicated] that he was concerned with how Hess would "hold up" on cross-examination[:]

- 10 -

[Hess] and I spent a lot of time getting ready for his testimony, and one of the biggest hurdles I knew that he was going to be facing, both [on] direct and cross-examination, was the fact that the prosecutor was going to get to say he lied to the police. [The prosecutor was] an incredibly aggressive cross-examiner, so I was attempting to prepare him for that. My concern [was,] I did not think [] raising the issue benefited us. It may have benefited in an infinitesimal amount, but I thought it would expose him to a much [harsher] treatment on cross-examination. I was worried how he would hold up on cross-examination having changed to a third version of what had happened that night. So I did not think that it benefited us enough to warrant the downside that would damage his credibility and our defense.

[*Id.* at 99].

Based upon [counsel's] reasoning and testimony, [the court] cannot say that [counsel] had no reasonable basis for not introducing evidence relating to Hess's epilepsy and seizures at trial.

PCRA Court Opinion, 6/13/25, at 40-43 (some citations and quotation marks omitted). The PCRA court's credibility determination is binding on this Court, as it is supported by the record, and we discern no error in the court's legal conclusion. *See **Baynard***, 355 A.3d at 26. Accordingly, Hess's ineffectiveness claim fails, and his first issue does not merit relief.

Next, Hess claims that counsel was ineffective for failing to call Whitey and Lisa Jensen to testify to Drake's reputation for untruthfulness at trial. ***See*** Appellant's Brief, at 25. Where a PCRA petitioner's ineffectiveness claim is based on counsel's failure to call a witness, the petitioner must establish that: "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the

- 11 -

witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." *Commonwealth v. Abdul-Ali*, 345 A.3d 759, 775 (Pa. Super. 2025) (citation omitted).

At the PCRA hearing, Whitey Jensen testified that Drake, his biological daughter, had a reputation in the community for being dishonest. *See* N.T. PCRA Hearing, 5/30/24, at 45, 48. Likewise, Linda Jensen testified that Drake, her husband's daughter, had a reputation for dishonesty in the community. *Id.* at 53. When Linda was questioned about Drake's behavior the morning after the incident, the following exchange ensued:

Q.    Can you describe for us what you saw?

A.    She came in. She was crying a little bit and that stopped and then she took about a two-hour nap. She woke up and went to the movies.

Q.    Okay. To your mind, did she display any sort of indicators of remorse or trauma from what had happened the night before?

A.    Absolutely nothing.

*Id.* at 55-56. Linda further testified that on the day after the incident, Drake exhibited a "normal" demeanor, made various phone calls, "spent a lot of time on Facebook," and, later in the evening, went to the mall with friends. *Id.* at 57, 58.

Hess avers that the testimony of Whitey and Linda "would have been admissible at trial as negative character evidence to impeach Drake's credibility." Appellant's Brief, at 26. Hess contends that counsel's failure to

call these purported witnesses constituted ineffective assistance where the witnesses "were both available and willing to testify at trial for the defense," Hess "had given [counsel] their names," and the witnesses were "particularly credible" given their intimate familiarity with Drake "and her reputation for dishonesty." *Id.* at 26. Hess further contends that Whitey's "negative assessment of Drake's credibility would have carried special weight" because "he was her father and naturally inclined to present her in a favorable light." *Id.*

Hess's second ineffectiveness claim does not warrant relief, as he has not demonstrated that counsel knew of the existence of the witnesses. *See Abdul-Ali*, 345 A.3d at 775. At the PCRA hearing, counsel testified that, prior to trial, Whitey and Linda were not identified to him as potential witnesses who could impeach Drake's trial testimony. *See* N.T. PCRA Hearing, 5/30/24, at 92-93. When asked whether Whitey was a witness counsel would have presented as a negative character witness after learning what he would have testified to at trial, counsel testified that Whitey "would have been a witness that [counsel] would have strongly considered presenting based upon additional conversations that [counsel would have] had with him." *Id.* at 92. However, counsel reiterated that he "did not know any of that" prior to trial. *Id.* Counsel similarly testified that he would have "strongly considered" calling Linda Jensen as a negative character witness, depending on additional conversations he would have had with her concerning the basis of her

knowledge, but he was unaware of her existence and her purported testimony. *Id.* at 92, 93. On cross-examination, counsel further testified that he "contacted everyone whose name and contact information" Hess and his family had provided as potential witnesses. *Id.* at 94. The PCRA court credited counsel's testimony and concluded that Hess "failed to establish that [counsel] was aware of or should have been aware of Whitey or Linda" and thus, he failed to demonstrate that no reasonable basis existed for counsel's failure to present them as witnesses at trial. PCRA Court Opinion, 6/13/25, at 50. The PCRA court's credibility determination, which is supported by the record, is binding on this Court, and we discern no error in its conclusion. *See Baynard*, 355 A.3d at 25.

Based on the foregoing, Hess is not entitled to his requested relief, and we affirm the PCRA court's order dismissing his petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/10/2026